**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and DILLARD, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**November 30, 2012**

# In the Court of Appeals of Georgia

A12A1602. NALLEY et al. v. LANGDALE.                JE-073

A12A1603. NALLEY et al. v. LANGDALE.                JE-074

A12A1604. NALLEY et al. v. THE LANGDALE COMPANY.     JE-075

A12A1605. NALLEY et al. v. LANGDALE.                JE-076

A12A1606. NALLEY et al. v. LANGDALE.                JE-077

A12A1607. LANGDALE v. NALLEY et al.                 JE-078

ELLINGTON, Chief Judge.

These consolidated cases concern a trust created in 1959 by Judge Harley Langdale, Sr. ("Judge Langdale"). The plaintiffs, who are beneficiaries under the trust or their legal representatives, filed suit in the Superior Court of Lowndes County, claiming, inter alia, that the trustees breached their fiduciary duties in administering the trust and in distributing the trust corpus, which was comprised of stock held in The Langdale Company ("TLC"). The parties filed cross-motions for summary judgment,

which the trial court granted in part, largely in favor of the defendants. The plaintiffs appeal, and one of the former trustees, defendant Harley Langdale, Jr. ("Harley Jr."), has filed a cross-appeal. For the reasons explained below, we affirm in part and reverse in part.

> In order to prevail on a motion for summary judgment under OCGA § 9-11-56, the moving party must show that there exists no genuine issue of material fact, and that the undisputed facts, viewed in the light most favorable to the nonmoving party, demand judgment as a matter of law. Moreover, on appeal from the denial or grant of summary judgment[,] the appellate court is to conduct a de novo review of the evidence to determine whether there exists a genuine issue of material fact, and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.

(Citations omitted.) *Benton v. Benton*, 280 Ga. 468, 470 (629 SE2d 204) (2006).

1. Viewed in the light most favorable to the nonmovants, the record shows the following relevant facts.

(a) *The Langdale Company.* In 1947, Judge Langdale incorporated TLC,[1] a closely-held, family-owned business headquartered in Valdosta. The ownership of

---

[1] TLC functions as a holding company for subsidiaries that conduct a number of businesses (including forest products, auto dealerships, and banks) and whose assets include substantial tracts of timberland.

TLC was initially divided evenly between its first directors, Judge Langdale and his three sons, Harley Jr., John Langdale Sr. ("John Sr."), and William Langdale ("Billy.") Judge Langdale also had a daughter, Virginia Langdale Miller ("Virginia"). Between 1956 and 2000, each of the sons served a few years as an officer of TLC or a member of the Board of Directors, and Virginia served as a director for approximately 12 years.

Over the years, TLC appraised its stock[2] using the "Stanley methodology," a formula developed by Dr. Kenneth Stanley, a professor in the business school at Valdosta State College and a paid consultant of TLC, for estimating the value of stock in private, closely-held corporations. According to Stanley, because there typically is no active market for a minority interest in a private, closely-held corporation, it is difficult to estimate the value of the stock.[3]

There is some evidence that a disagreement existed in the Langdale family concerning the governance of TLC. Billy and his sons formed one faction, and Harley

---

[2] In 1974, TLC issued non-voting shares of stock, designated Class B; the original common (voting) shares were amended and designated Class A.

[3] The record shows that Stanley appraised TLC stock for the company almost every year from 1987 through 1999. The estimates were done primarily for establishing the value of stock for estate and gift tax purposes in accordance with IRS rules.

Jr., John Sr., and John Sr.'s son, John W. Langdale, Jr. ("Johnny") formed the other. There is some evidence that Harley Jr., John Sr., and Johnny planned to consolidate ownership and control of TLC in Johnny's line of descendants.[4] There is no evidence, however, that Billy and his sons actively competed for control of TLC. Billy and his sons sold their interest in TLC to the company in 2009 following a lawsuit.[5]

The record shows that, beginning in 1976, TLC executed a number of shareholders' agreements restricting the sale of TLC stock. On February 25, 1994, all of TLC's shareholders, including the trust through its trustees, Harley Jr. and John Sr., entered into a new shareholders' agreement governing the purchase and sale of TLC stock. The 1994 shareholders' agreement provided that no shareholder could sell or transfer TLC stock to a third party without first offering to sell or transfer the stock to TLC or the remaining shareholders. It also provided that the "agreed value [of the stock] shall be arrived at using a new evaluation employing the same methods and

---

[4] The plaintiffs point to what they contend is evidence of a 1993 "takeover plan" by Harley Jr. and Johnny. These plans appear to have been generated by a consultant who met with certain TLC board members and who proposed that TLC use insurance products to fund stock redemptions from shareholders upon their death. The plaintiffs contend that, pursuant to this plan, Harley Jr. and John Sr. executed documents that would give Johnny control of TLC's voting shares.

[5] TLC acquired control of the voting stock held in trust for Virginia in 1999 and 2000, as will be discussed further below.

4

guidelines used by [Stanley] in his appraisal dated the 29th day of December 1993, and using [TLC's] profit and loss statements for the fiscal year immediately preceding the date of evaluation."

(b) *The Trust Agreements.* Judge Langdale sought to provide for his daughter, Virginia, who was not one of the original TLC shareholders, by placing his shares of TLC stock in trust for her and for her descendants. On December 8, 1959, Judge Langdale executed an irrevocable trust agreement for her benefit.[6] Judge Langdale, on that same day, funded the trust with his interest in TLC, 250 shares of common stock. He appointed John Sr. and Harley Jr. as co-trustees, and both co-trustees signed the trust agreement. The trustees controlled the trust property, and were given wide discretion to manage and invest the trust corpus as the "[t]rustees may deem advisable." This discretion included selling or transferring trust holdings "either at public or private sale, at such prices and places and at such times as they consider[ed] best, without advertisement" or court order, in "their uncontrolled discretion," so long as it was "in the best interest of [the] Trust."

---

[6] The agreement provided that "this Trust is and shall be irrevocable and that[,] after the execution of this Trust[,] I . . . shall have no right to alter, amend, revoke or terminate this Trust or any provision thereof."

At the time the trust was created, Virginia had three living children, Langdale Nalley ("Dale"), James R. Miller ("Jimmy"), and Virginia Ruth Miller. The trust agreement provided that the net income of the trust was to be distributed annually to Virginia and her children and that, after the death of Virginia, "the net income shall be divided annually into as many shares as there are children of [Virginia] living and deceased children with lineal descendants living." The agreement also provided that the trust "shall terminate on the 21st anniversary of the death of the last surviving beneficiary who was in life at the date of the execution" of the agreement, that is, Virginia, Dale, Jimmy, and Virginia Ruth. On the date that the trust terminated, the agreement directed that "[a]ll property remaining in the corpus of [the] Trust shall then, or as soon thereafter as practicable, be distributed to the persons then entitled to the income, to be theirs absolutely in the same proportion as they are entitled to the income." Thus, this agreement was a generation-skipping trust.[7]

On December 16, 1959, John Sr. sent a conformed copy[8] of this agreement to Virginia and to Judge Langdale's accountant. A 1997 letter to Harley Jr. from

---

[7] See, generally, IRC § 2611 (a) (defining the term "generation-skipping transfer" for estate tax purposes).

[8] A "conformed copy," as the parties use that term, is a copy in which the handwritten signatures are replaced by the notation "/s/."

6

Virginia's estate planning attorney indicated that both Virginia and her attorney believed the trust agreement was the operative agreement and noted that "the Trust works very well for Virginia and her descendants, in that it skips generations for estate tax purposes[.]" Virginia's accountant, who also had a copy of the generation-skipping trust agreement, had the same understanding of the trust.

Almost immediately after executing the generation-skipping trust agreement, however, Judge Langdale apparently changed his mind[9] about when the trust should terminate, and he executed a new trust document, the "1999 terminating trust agreement."[10] The terms of the 1999 terminating trust agreement and the generation-

---

[9] Copies of unsigned letters found in John Sr.'s files indicate that, on December 29, 1959, John Sr. wrote to Judge Langdale's accountant, advising him that his father had "[s]hortly after execution . . . changed his mind and desired that the Trust should terminate on December 31, 1999[,] rather than as originally drafted." John Sr. told the accountant to "destroy this letter and [to] destroy the copy [of the original trust agreement] which was forwarded to you previously." The record also shows that someone marked a red "X" across the first page of the generation-skipping trust agreement and placed it in a file in John Sr.'s filing cabinet.

[10] The 1999 terminating trust agreement was signed by Judge Langdale, the same trustees, and the same witness, was notarized, and was also dated December 8, 1959. The original of this agreement was attached to a gift tax return that Judge Langdale filed following the creation of the trust, and the documents were placed in a vault at TLC's headquarters. There is no dispute that Judge Langdale signed both trust agreements. There is also no evidence, however, that he intended to create two separate trusts. In fact, he only owned 250 shares of common stock in TLC, so he could not have transferred 250 shares to two individual trusts. There is no evidence

7

skipping trust agreement are almost identical. Both agreements provide that the corpus of the trust would be comprised of 250 shares of TLC common stock, name John Sr. and Harley Jr. as co-trustees, and provide that the net income of the trust is to be distributed annually to Virginia and to her children equally, with her grandchildren to receive per stirpes the share of a deceased parent. Unlike the generation-skipping trust agreement, however, the 1999 terminating trust agreement provides that "[the] Trust shall terminate on the 31st day of December, 1999. All property remaining in the corpus of this Trust shall then, or as soon thereafter as practicable, be distributed to the persons then entitled to the income, to be theirs absolutely in the same proportion as they are entitled to the income."

Harley Jr. served as a co-trustee of the trust until December 27, 2010, and he was the trustee who primarily communicated with the income beneficiaries. John Sr. served as a co-trustee until a serious illness prompted him to resign on December 30, 1994.[11] His son, Johnny, succeeded him as a co-trustee in 1994 pursuant to a

that Judge Langdale, who died in 1972, made any statement concerning the operative agreement.

[11] There is no evidence in the record that suggests that John Sr. engaged in any discussions with the beneficiaries or their advisors concerning the sale of TLC stock while he was a trustee. He resigned in 1994 and he died in early 1998.

document executed in October 1993 by Harley Jr. and John Sr.[12] The plaintiffs contend that they were not aware that Johnny had been appointed trustee. Johnny, however, was aware that he was a trustee. On May 27, 1999, Johnny resigned as trustee with the consent of the trust's beneficiaries. Bob, Billy's son, was appointed to replace Harley Jr. in 2010.

(c) *The Sale and Distribution of the Trust Corpus.* It is unclear from the record who initially proposed allowing TLC to redeem the stock held in the trust. The record shows, however, that discussions concerning the disposition of that stock were underway in late 1997. On August 8, 1997, Virginia's lawyer, Jay Reynolds, wrote to Harley Jr. and asked for information concerning the trust, its assets, and its trustees, so he could advise Virginia about her estate planning. On August 13, Harley Jr. responded, informing Reynolds that the value of the stock was difficult to estimate and that TLC had used the Stanley methodology to value the stock in the past. On September 2, Reynolds wrote to Harley Jr. again, stating: "Virginia mentioned to me, she had understood from you, that in 1999 there was to be some change in either the Trust or perhaps [the TLC] stock." Harley Jr. responded, stating that the trust was to

_____

[12] A similar document, executed by Harley Jr. alone, provided a schedule of successor trustees for the trust, beginning with Johnny and followed by Johnny's son, John Wesley Langdale III and, then by Billy's son, Robert Harley Langdale ("Bob").

terminate in 1999 and that "[o]ur plans are to distribute the [trust] assets" to the beneficiaries.

Reynolds wrote back immediately, expressing concern that the trust agreement in his possession did not show that the trust terminated on December 31, 1999. Harley Jr. responded on September 15:

> I have discussed [the trust] with John [Sr.] and he does not remember,[13] but he says it is apparent to him that our father must have changed his mind about the termination [provision] on the same day [he created the trust]. [John Sr.] says he can't recall when the conformed copy was sent to [Virginia], but apparently a copy of the first draft was handed to him and it was sent to [Virginia] in error. We regret that this has happened, but we are certain there is no signed instrument other than the [1999 terminating trust agreement] enclosed with this letter.

From this point forward, the trustees proceeded as though the 1999 terminating trust governed. Virginia, Dale, and Jimmy (hereinafter, "the income beneficiaries")[14] and their advisors had "multiple discussions" with TLC representatives concerning the disposition of the stock in the trust. The income beneficiaries were represented by

---

[13] The record indicates, however, that in April of 1997, John Sr.'s administrative assistant had written a memorandum concerning the trust on John Sr.'s behalf which indicated that John Sr. was of the opinion that the trust did *not* terminate in 1999.

[14] Virginia's third child, Virginia Ruth, died in 1971.

their attorney, Reynolds, and by a certified public accountant, Deborah Chambless. In April 1999, Reynolds and Chambless met with TLC representatives to discuss a plan for TLC to redeem the trust's shares. Both Reynolds and Chambless deposed that they were told that the redemption plan required valuing the stock according to the Stanley methodology as set forth in the shareholders' agreement.

In late 1998, Johnny and TLC's chief financial officer, Steve Watts, began planning how TLC would redeem the stock held in the trust. Watts deposed that he and Johnny thought it was a good idea for TLC to redeem the stock, that TLC had "good cash flow" at the time and that owning the stock would "accrete to [TLC's] earnings." Watts also conceded that the stock redemption plan was intended to give Johnny control of TLC. According to Watts, Johnny wanted to keep the deal quiet because he was afraid that if Billy's family found out that they would either spoil the deal by telling the income beneficiaries what they believed the stock was worth or that they would bid on the stock and, if they "got control of the company, they would want it sold and therefore Johnny and all of those guys would lose their jobs." Watts further deposed that Johnny was trying to convince Virginia and Jimmy "to let the trust sell its stock to [TLC]."

During the negotiations, the co-trustees of the trust were Harley Jr. and Johnny. Both Harley Jr. and Johnny were also shareholders of TLC and together controlled more than half of TLC's voting stock.

On May 5, 1999, Reynolds wrote to Watts, expressing his clients' interest in proceeding with the stock redemption. TLC made a number of internal financial documents available for Reynolds and Chambless to review, including past stock valuations, TLC balance sheets, statements concerning operating expenses and earnings, and reports of independent auditors. On May 21, 1999, Watts wrote a proposal for Harley Jr.'s approval, outlining how to redeem the stock from the trust with the consent and approval of the income beneficiaries and of the TLC Board of Directors. Ultimately, the parties agreed to break the transaction into two parts for tax purposes, a May 1999 sale and distribution and a January 2000 sale and structured payment over a ten-year term.

On May 28, 1999, TLC redeemed the trust's voting stock and entered into a number of agreements, including an irrevocable option agreement for the purchase of the balance of the stock at the predetermined Stanley value. On the same day, Harley Jr., still in his capacity as trustee, entered into a reimbursement and indemnification agreement with the income beneficiaries. In the agreement, the income beneficiaries

acknowledged that they "have requested that the Trustee enter into a transaction to sell a portion of [the TLC] stock prior to December 31, 1999," and distribute the cash proceeds to them. In return, the income beneficiaries agreed

> to release, indemnify, save and hold harmless the Trustee, of, from and against any and all liabilities, claims, demands, causes of action, costs, . . . and judgments incurred or suffered on behalf of the Trustee, whether presently existing or arising in the future, whether from claims made by them or on their behalf or by any other person having an interest in the Trust, such as contingent or alternate beneficiaries of the Trust, which in any way relate to, or arise from: the sale of the stock by the Trustee; the distribution of the Net Cash Proceeds; . . . and any other agreements contained herein or actions of the Trustee under or related to this Agreement.

After the closing of the Redemption Agreement and the execution of the reimbursement and indemnification agreement, Virginia, Dale, and Jimmy each received checks for approximately $2.4 million, each check representing one third of the proceeds from the stock redemption.

On January 4, 2000, Harley Jr., acting as trustee, notified TLC that the trust had terminated and directed TLC to reissue the remaining class B stock that he held on behalf of the trust to Virginia, Dale, and Jimmy. TLC's Board of Directors adopted a resolution on January 24, authorizing the company's representatives to redeem the

13

balance of the stock. On January 28, 2000, TLC redeemed the balance of the stock pursuant to agreements substantially similar to those executed in May. After executing the agreements, Virginia, Dale, and Jimmy each received checks for $1.6 million and ten-year installment notes for $5 million plus interest.

(d) *The Instant Lawsuit.* Sometime in 2007, Dale had a conversation with her cousin that led her to believe that she, Virginia, and Jimmy had gotten "shortchanged" in the sale of the TLC stock. The income beneficiaries met with counsel to investigate claims that they had been defrauded. In May 2009, Dale, individually and as attorney-in-fact for Virginia, and James IV, individually and as executor of Jimmy's estate, filed this action against Harley Jr., Johnny as the executor of John Sr.'s estate, and Johnny individually. TLC was added as a defendant in 2010. Virginia, Dale, and Jimmy (the income beneficiaries) premised their complaint on an averment that the 1999 terminating trust agreement was the operative agreement. They asserted claims for breach of trust, breach of fiduciary duty, fraud, constructive trust, and conspiracy. In essence, the income beneficiaries averred that the stock that TLC redeemed was worth at least $100 million more than TLC paid for it and that they were consequently damaged to the extent of the difference between the stock's true value and the amount they actually received when Harley Jr. distributed the trust's corpus to them. The

14

plaintiffs' expert opined that the TLC stock was worth significantly more than the Stanley value. The defendants dispute the plaintiffs' valuation of the stock; however, they concede that Stanley's valuation in this case may not have taken into account the full value of some of TLC's assets or holdings. In addition, the plaintiffs averred that the stock redemption agreement, by reducing the number of voting shares and by paying only a fraction of the stock's value, substantially increased the value of the TLC stock owned and controlled by the defendants and enabled them to control TLC for their own profit. The income beneficiaries prayed that a constructive trust be imposed upon the defendants' TLC stock and upon all benefits the defendants gained as a result of their alleged scheme.

In June 2009, attorneys representing Harley Jr. and Johnny discovered the original, generation-skipping trust in one of John Sr.'s filing cabinets. These defendants filed their answers, asserting defenses based upon the discovery of the generation-skipping trust instrument; Harley Jr. also asserted counterclaims against the income beneficiaries, seeking the return of the proceeds of the stock redemptions. Harley Jr. asserted that he relied upon the 1999 terminating trust agreement in good faith and denied that he acted intentionally or negligently in disbursing the trust corpus to the income beneficiaries.

15

After Harley Jr. and Johnny filed their answers, the income beneficiaries amended their complaint on September 3, 2009, adding as plaintiffs Virginia's six grandchildren, that is, James IV (individually) and Dale's five children. William McIntosh was appointed guardian ad litem for the minor and unborn potential remainder beneficiaries, and he joined the litigation as a plaintiff on February 19, 2010. Bob, the successor trustee, also joined the suit as a plaintiff on January 7, 2011. These additional plaintiffs aligned themselves with the income beneficiaries and adopted the allegations of the complaint.

The plaintiffs asserted that, "since the beneficiaries – all of them – have elected to seek a damages remedy, the May 28, 1999 transaction stands." The remainder beneficiaries and their representatives also took the position that they have elected to affirm the transaction and pursue a damages remedy for breach of trust. All of the plaintiffs have asserted that they would redistribute any award of damages in the instant suit to the remainder beneficiaries. And, if there is no award of damages, they have agreed to redistribute to the remainder beneficiaries the funds paid to the income beneficiaries with court approval. We note that all of the parties have taken the position that the generation-skipping trust agreement is the operative trust agreement

16

and that Judge Langdale lacked the authority to revoke that agreement or to alter any of its provisions, as he attempted to do when executing the 1999 terminating trust agreement.

After hearings on the various motions, the trial court granted summary judgment in favor of Johnny, individually, on the plaintiffs' claims. The plaintiffs appeal this ruling in Case No. A12A1602. The court also granted summary judgment in favor of Johnny, as the executor of the estate of John Sr., on the plaintiffs' claims. The plaintiffs appeal this ruling in Case No. A12A1603. The trial court granted summary judgment in favor of TLC on the plaintiffs' claims, and the plaintiffs appeal this ruling in Case No. A12A1604.

The trial court denied Harley Jr.'s motion for summary judgment in part as to the remainder beneficiaries' claims that he "committed a breach of trust or breach of fiduciary duty by dispersing the trust corpus to the income beneficiaries." The trial court otherwise granted summary judgment in favor of Harley Jr. on the plaintiffs' claims. In Case No. A12A1605, the plaintiffs appeal the grant of partial summary judgment in favor of Harley Jr. In Case No. A12A1607, Harley Jr. appeals the denial of partial summary judgment on the issue of whether he committed a breach of trust or fiduciary duty by dispersing the trust corpus to the income beneficiaries.

17

Finally, the trial court denied the plaintiffs' motion for summary judgment on Harley Jr.'s counterclaims, and the plaintiffs appeal this ruling in Case No. A12A1606.

*Case Nos. A12A1605 and A12A1607*

2. In Case No. A12A1605, the plaintiffs contend that the trial court erred in granting partial summary judgment in favor of Harley Jr. on their claims.[15] Specifically, they contend that Harley Jr.'s allegedly false statements gave rise to claims for fraud and breach of trust against Harley Jr. as a trustee.[16] They argue that

---

[15] The counts of the original complaint, as amended, against Harley Jr. are for (1) breach of trust, (2) breach of fiduciary duty, (3) breach of fiduciary duty as a director of TLC, (4) fraud, (5) constructive trust, and (6) conspiracy. Counts (5) and (6) do not state independent causes of action. A claim for the imposition of a constructive trust is not an independent cause of action. *Morrison v. Morrison*, 284 Ga. 112, 113 (1) (663 SE2d 714) (2008). And where a plaintiff seeks to impose civil liability for a conspiracy, the conspiracy in and of itself furnishes no independent cause of action. *Cook v. Robinson*, 216 Ga. 328, 328-329 (1) (116 SE2d 742) (1960). Rather, the "gist of the action, if a cause of action exists, is not the conspiracy alleged, but the tort committed against the plaintiff and the resulting damage." (Citation omitted.) Id. at 329 (1). See also *Alta Anesthesia Assoc. of Ga. v. Gibbons*, 245 Ga. App. 79, 85 (3) (537 SE2d 388) (2000). Thus, the claims at issue are those for fraud and breach of trust.

[16] The plaintiffs make no argument that the trial court erred in granting summary judgment on their claim against Harley Jr. for breach of fiduciary duty as a director of TLC. That claim of error, therefore, is deemed abandoned. Court of Appeals Rule 25 (c) (2).

18

Harley Jr.'s "fraudulent misrepresentations and concealments were the entire foundation of the [stock] transaction, and the transaction could not have occurred without them." They also argue that they were "severely damaged" by Harley Jr.'s actions in that he sold the stock to TLC for less than its true value and that he "disenfranchised" the remainder beneficiaries by distributing the trust corpus in 1999.

In both Case Nos. A12A1605 and A12A1607, Harley Jr. contends that all of the plaintiffs ratified the stock transactions and the distribution of the trust corpus, thereby estopping them from pursuing claims for breach of trust or fraud arising out of those transactions.[17] Therefore, he argues that the trial court's partial grant of summary judgment in his favor was correct, but that the court erred in denying his motion for summary judgment as to the plaintiffs' claim for the wrongful distribution of the trust corpus.

---

[17] Harley Jr. also contends that the plaintiffs' claims are barred by the six-year statute of limitation concerning a breach of trust, OCGA § 53-12-307. We find no merit to this contention, however. The original plaintiffs filed suit in 2009, two years after they discovered that they may have been paid less for the stock than it was actually worth. The additional plaintiffs joined the suit as soon as they learned of the existence of the generation-skipping trust instrument. See *Snuggs v. Snuggs*, 275 Ga. 647, 647-648 (1) (571 SE2d 800) (2002) ("The applicable statute of limitation for a breach of trust claim . . . , is, in relevant part, six years from the date the beneficiary discovered, or reasonably should have discovered, the subject of the claim.") (punctuation and footnote omitted.)

It is undisputed that, under the generation-skipping trust agreement, the trustees were not authorized to distribute the trust corpus to anyone in 1999. Yet Harley Jr., acting as trustee, allowed the stock comprising the trust corpus to be distributed to the income beneficiaries in violation of the terms of the trust instrument and then allowed TLC to redeem it from the beneficiaries at a price the plaintiffs argue was a fraction of its true value. They argue that Harley Jr. "duped" them into the transactions at issue by misrepresenting the trust's termination date, that he conspired with others to orchestrate a clandestine stock redemption pursuant to the shareholders' agreement to suppress the value of the stock, and that he used the stock redemption to increase the value of his stock and to consolidate control of TLC in Johnny's line of descendants.

Given that Harley Jr. was a trustee when the stock redemption occurred, any claim against him sounding in fraud is also a claim for breach of trust. "The trustee shall be accountable to the beneficiary for the trust property. A violation by the trustee of any duty that the trustee owes the beneficiary shall be a breach of trust." OCGA § 53-12-300.[18] In order to recover for a trustee's breach of trust, a beneficiary must

_____

[18] Although the Revised Georgia Trust Code became effective July 1, 2010, it applies to any trust regardless of the date such trust was created, with two exceptions: "to the extent it would impair vested rights" and "except as otherwise provided by

20

show proof of damages proximately caused by the breach. See *SunTrust Bank v. Merritt*, 272 Ga. App. 485, 489 (2) (612 SE2d 818) (2005) ("Establishing a claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach.") (punctuation and footnote omitted). In this case, the plaintiffs argue that Harley Jr. breached his duties as a trustee of good faith and loyalty[19] by fraudulently inducing the income beneficiaries to enter into the stock redemption transactions. As we have held,

> The tort of fraud has five elements: a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff. For an action for

---

law." OCGA § 53-12-1 (b); see also *McPherson v. McPherson*, 307 Ga. App. 548, 550 (1) (a) (705 SE2d 314) (2011). As no party has shown that either exception applies in this case, we proceed under the Revised Trust Code as supplemented by the common law. See *McPherson*, 307 Ga. App. at 550-551 (1) (a).

[19] A trustee is a fiduciary. Fiduciaries are held to the highest standard of the law. A "fiduciary" is a "person who is required to act for the benefit of another person on all matters within the scope of their relationship; one who owes to another the duties of good faith, trust, confidence, and candor." *AltaVista Health Care, Inc. v. Miller*, 286 Ga 122, 127 (686 SE2d 96) (2009), quoting Black's Law Dictionary (8th ed. 2004) (Melton, J., dissenting).

fraud to survive a motion for summary judgment, there must be some evidence from which a jury could find each element of the tort.

(Citations omitted.) *Crawford v. Williams*, 258 Ga. 806 (375 SE2d 223) (1989). "Given that fraud is inherently subtle, slight circumstances of fraud may be sufficient to establish a proper case. . . . Moreover, it is peculiarly the province of the jury to pass on these circumstances showing fraud." (Citations omitted.) *Almond v. McCranie*, 283 Ga. App. 887, 889 (2) (643 SE2d 535) (2007).

In the instant case, the plaintiffs have asserted facts from which the jury could infer that Harley Jr. exceeded the scope of his discretion as a trustee and committed a breach of trust. He represented to the income beneficiaries that the trust terminated in 1999, and that representation was false. Under the circumstances of this case, whether that representation was made negligently, fraudulently, or in good faith remains for the jury to resolve. In the record before us, there is some evidence from which the jury might infer that Harley Jr. intentionally induced the income beneficiaries to enter into the stock redemption transactions for his personal gain, that is, for obtaining control of TLC at a discount and for maximizing the value of his own shares. There is some evidence that using the Stanley methodology resulted in a low value for the trust's stock. Further, the jury may infer that the income beneficiaries

22

were justified in relying on Harley Jr.'s representation that the trust terminated in 1999 and that the stock was properly valued because Harley Jr. was, in fact, their trustee and owed them a fiduciary duty. Finally, although the income beneficiaries received a windfall in that they received a payment comprising the entire trust corpus rather than a payment for annual income, all of the plaintiffs were damaged in that the trustee did not allocate the trust proceeds according to the settlor's intent.[20] In light of the evidence as outlined above, we conclude that the plaintiffs presented sufficient evidence on each element of fraud and breach of trust to survive a motion for summary judgment.

Harley Jr. contends that, pretermitting whether he made any fraudulent misrepresentations, the plaintiffs ratified any fraud at issue in the stock transactions or any breach of trust in the distribution of the trust corpus. We disagree. "In general, a party alleging fraudulent inducement to enter a contract has two options: (1) affirm the contract and sue for damages from the fraud or breach; or (2) promptly rescind the contract and sue in tort for fraud." (Citations omitted.) *Ainsworth v. Perreault*, 254

---

[20] In trusts like the generation-skipping trust at issue, that is, those with income beneficiaries and remainder beneficiaries, "the interests of the two beneficiaries are to a certain extent antagonistic, and the trustee is under a duty so to administer the trust as to preserve a fair balance between them." (Citation, punctuation and footnote omitted.) *SunTrust Bank v. Merritt*, 272 Ga. App. 485, 488 (1) (612 SE2d 818) (2005).

Ga. App. 470, 471 (1) (563 SE2d 135) (2002). The right to affirm the contract and the right to sue for damages due to fraud coexist. (Citation and punctuation omitted; emphasis supplied.) *Tuttle v. Stovall*, 134 Ga. 325, 330 (67 SE 806) (1910). However, if the defrauded party, "with knowledge of the fraud, does an act in ratifying or affirming the contract which shows his intention to abide by the contract as made, with the fraud in it, and thus waives the fraud, he can not afterwards set up the fraud and recover damages therefor." Id. at 329. Whether such a ratification has occurred "is usually a fact question for the jury." *Brock v. Yale Mtg. Corp.*, 287 Ga. 849, 855 (700 SE2d 583) (2010).

Similarly, a beneficiary may also ratify a breach of trust. "[E]ven though an act of the trustee is unauthorized and constitutes a breach of trust, it may be so acquiesced in, confirmed, or ratified by the cestui que trust as to estop him or her from repudiating it and attempting to hold the trustee liable." (Footnote omitted.) 90A C.J.S. Trusts, § 334.[21] However, the cestui que trust must have acted with full knowledge of all facts and of his or her legal rights. Id.; see also *Warner v. Hill*, 153

---

[21] See also Bogert, Law of Trusts, 5th ed., p. 629 (After the commission of a breach of trust or other wrong to the beneficiary, the latter may approve of the act and thus prevent himself from asserting later [that] he has a cause of action. This is generally called 'ratification.'") (footnote omitted).

24

Ga. 510, 513 (112 SE 478) (1922) (The beneficiaries of a trust may impliedly ratify the actions of the trustee by accepting the benefits of the action.). "Generally[,] the question of ratification is one which depends upon the intention of the parties, and is a matter of fact to be determined by the jury." (Citations omitted.) *Warner v. Hill*, 153 Ga. at 513.

We cannot say that the acceptance of the benefit flowing from the unauthorized distribution of the trust corpus and the sale of the stock by the income beneficiaries amounts to an implied ratification as a matter of law in this case because the plaintiffs did not learn about the existence of the generation-skipping trust instrument until after suit was filed and their election made; further, all of the plaintiffs have agreed that any recovery should be structured to compensate those newly-discovered remainder beneficiaries. Whether, given these facts, the plaintiffs intended to ratify any breach of trust remains a question of fact for the jury to resolve.

Accordingly, we reverse the trial court's grant of partial summary judgment to Harley Jr. on the plaintiffs' claims for fraud and breach of trust. We also affirm the trial court's order denying Harley Jr.'s motion for summary judgment on the plaintiffs' claims that he "committed a breach of trust or breach of fiduciary duty by dispersing the trust corpus to the income beneficiaries."

25

3. The income beneficiaries contend that the trial court erred in denying their motion for summary judgment on Harley Jr.'s counterclaims. They contend that Harley Jr. cannot prosecute claims for the return of the trust corpus, whether those claims sound in unjust enrichment, recoupment, set-off, constructive trust, or money had and received, because Harley Jr. is no longer the trustee and such a claim can only be prosecuted on behalf of the trust by the current trustee. They also contend that Harley Jr. is not entitled to indemnity for his allegedly wrongful distribution of the trust corpus, because the indemnity agreement that the income beneficiaries executed did not indemnify Harley Jr. for his own negligence, wrongdoing, or other misconduct.

(a) *Claims for the Return of Trust Funds.* Harley Jr. asserted his counterclaims for unjust enrichment, money had and received, recoupment, and constructive trust in his capacity "as trustee," seeking the return of misapplied trust funds in the possession of the income beneficiaries. Because Harley Jr. is no longer the trustee, however, he lacks standing to pursue claims on behalf of the remainder beneficiaries for the return of the trust funds. Rather, the right to pursue an action concerning the wrongful distribution of trust funds belongs exclusively to the trust beneficiaries or to one with

26

the authority to act on behalf of the trust beneficiaries, such as a co-trustee or successor trustee. OCGA § 53-12-301.[22] Consequently, the trial court erred in denying the plaintiffs' motion for summary judgment as to Harley Jr.'s counterclaims for the return of the trust corpus.

(b) *Claims for Indemnification and Set-off.* It is undisputed that, during the May 1999 sale of stock, the income beneficiaries signed indemnification agreements "to release, indemnify, save and hold harmless" Harley Jr. as trustee from any claims – including those made by contingent beneficiaries – arising from the sale of the stock and distribution of proceeds. Similarly, at the January 2000 closing, the parties agreed to indemnify each other for any loss, liability, or claim arising from any breach of the representations made in the agreement. The plaintiffs assert, however, that Harley Jr. should not be able to rely on the indemnification agreement to shield himself from his wrongdoing.

> Public policy is reluctant to cast the burden of negligent actions upon
> those who are not actually at fault. Thus it is well established in Georgia
> that contractual indemnities do not extend to losses caused by an

---

[22] That Code section provides, in relevant part, that "[i]f a trustee commits a breach of trust, or threatens to commit a breach of trust, *a beneficiary shall have a cause of action* to seek . . . [t]o compel the trustee to redress a breach of trust by payment of money or otherwise[.]" (Emphasis supplied.) OCGA § 53-12-301 (a) (5).

indemnitee's own negligence unless the contract expressly states that the negligence of the indemnitee is covered. The words of the contract will be scrutinized closely to discover whether such an intent is actually revealed in them and every presumption is against such intention. In the absence of explicit language to the contrary, courts will not interpret an indemnity agreement as a promise by the indemnitor to save the indemnitee harmless on account of the latter's own negligence. Georgia courts never imply an agreement to indemnify another for one's own negligence in the absence of express language.

(Citations and punctuation omitted.) *Ryder Integrated Logistics v. Bellsouth Telecommunications*, 281 Ga. 736, 737-738 (642 SE2d 695) (2007). According to the plaintiffs, this policy applies to intentional wrongdoing as well as negligent acts. See, e.g., *Corbett v. Benioff*, 126 Cal. App. 772, 776 (14 P2d 1028) (1932) (indemnity clause was not intended to protect trustee against their own wrongful conduct in violation of the trust).

Here, however, we have found that issues of fact remain as to whether Harley Jr. engaged in wrongful conduct or acted in bad faith. If a jury finds that Harley Jr. acted in good faith and within his discretion as a trustee in selling the stock, Harley Jr. should be permitted to invoke the indemnity clause in his defense. See, e. g., *Coleman v. B-H Transfer Co.*, 284 Ga. 624, 627 (3) (669 SE2d 141) (2008) (Georgia

28

courts will enforce an indemnification clause in a contract unless such enforcement contravenes public policy). It follows that the trial court properly denied the plaintiffs' motion for summary judgment as to the claim for indemnification and set-off.

*Case No. A12A1603*

4. The plaintiffs contend that the trial court erred in granting summary judgment to Johnny, as the executor of the estate of John Sr., on their claims against the estate. The plaintiffs' claims against John Sr.'s estate, as amended, are identical to those alleged against Harley Jr.[23] The trial court did not err in granting summary judgment in the estate's favor, as a matter of law, for the following reasons.

The claims against John Sr.'s estate fail for the reason that, as of the date of John Sr.'s death in 1998, none of the plaintiffs had suffered any injury flowing from John Sr.'s alleged wrongdoing and, therefore, any cause of action based on such wrongdoing was extinguished, pursuant to OCGA § 9-2-41.

"At common law[,] a cause of action for a personal tort abated on the death of the tort-feasor." *Smith v. Jones*, 138 Ga. 716 (76 SE 40) (1912). However, OCGA § 9-2-41, which is in derogation of the common law, provides:

---

[23] See footnote 15, supra.

29

No action for a tort shall abate by the death of either party, where the wrongdoer received any benefit from the tort complained of; nor shall any action or cause of action for the recovery of damages for homicide, injury to the person, or injury to property abate by the death of either party. The cause of action, in case of the death of the plaintiff and in the event there is no right of survivorship in any other person, shall survive to the personal representative of the deceased plaintiff. In case of the death of the defendant, the *cause of action* shall survive against said defendant's personal representative. However, *in the event of the death of the wrongdoer before an action has been brought against him, the personal representative of the wrongdoer in such capacity shall be subject to the action just as the wrongdoer himself would have been during his life*, provided that there shall be no punitive damages against the personal representative.

(Emphasis supplied.) See also *Wrinkle v. Rampley*, 97 Ga. App. 453, 454 (1) (103 SE2d 435) (1958) ("It follows that[,] if the plaintiff could not have maintained the [cause of] action against the decedent during his life, the action cannot be maintained against his personal representative.") (citation omitted). Thus the plaintiffs may prosecute an action against John Sr.'s estate only if the cause of action was viable against John Sr. before his death. "A cause of action has been defined as being the *entire* set of facts which give rise to an enforceable claim." (Citations and punctuation

30

omitted; emphasis in original.) *Haley v. Regions Bank*, 277 Ga. 85, 91 (2) (586 SE2d 633) (2003).

The plaintiffs seek to recover damages allegedly flowing from TLC's redemption of stock from the Trust and from the income beneficiaries. As recounted above, these transactions occurred in May 1999 and January 2000. John Sr. was neither a trustee nor a director of TLC at that time, having resigned from both positions in 1994. And he died on February 20, 1998, over a year before formal negotiations concerning the stock redemption commenced. The record is devoid of any evidence that the plaintiffs took any action to their detriment based upon anything John Sr. said or did. Moreover, no plaintiff had suffered any injury as a result of any alleged breach of trust prior to John Sr.'s death. Under the circumstances of this case, the plaintiffs' claims against John Sr. did not survive his death.

Because the plaintiffs had no cause of action against John Sr. before his death, any fraud claim against him must fail. See *Middleton v. Troy Young Realty*, 257 Ga. App. 771, 772 (572 SE2d 334) (2002) (An actionable claim for fraud requires proof of detrimental reliance upon a misrepresentation.). Moreover, no breach of trust ascribed to John Sr. proximately caused any injury to any beneficiary during John Sr.'s lifetime. See *Suntrust Bank v. Merritt*, 272 Ga. App. 485, 489 (2) (612 SE2d

818) (2005) (A claim for breach of fiduciary duty requires proof of injury proximately caused by the breach.). The plaintiffs' contention that the alleged breach of trust entitles them to nominal damages and that, therefore, they were injured, lacks merit. Under OCGA § 51-12-4, nominal damages are only available upon a showing of injury.[24] Under the circumstances of this case, the plaintiffs' causes of action against John Sr. do not survive to his estate. Therefore, the trial court did not err in granting summary judgment in the estate's favor.

As for the plaintiffs' claim against John Sr. for breach of fiduciary duty as a director of TLC, they have made no argument that the trial court erred in granting summary judgment on that claim. Therefore, it is deemed abandoned. Court of Appeals Rule 25 (c) (2).

*Case No. A12A1602*

5. The plaintiffs contend that the trial court erred in granting summary judgment in favor of Johnny, individually, on their claims. The plaintiffs' claims against Johnny, as amended, are for breach of trust and fraud and are identical to those alleged against

---

[24] "Damages are given as compensation for injury; generally, such compensation is the measure of damages where an injury is of a character capable of being estimated in money. If an injury is small or the mitigating circumstances are strong, nominal damages only are given." OCGA § 51-12-4.

32

Harley Jr.[25] and Johnny raises many of the same defenses. We conclude that the trial court erred in granting summary judgment in Johnny's favor, as a matter of law, for the same reasons set forth in Division 2, supra. The jury could infer from the evidence adduced that Johnny, who was a trustee when the plan to redeem the TLC stock from the trust was effectuated, acted in concert with Harley Jr., was aware of the existence of the generation-skipping trust agreement and the true value of the TLC stock, and took advantage of his position as trustee for personal gain.

As for the plaintiffs' claim against Johnny for breach of fiduciary duty as a director of TLC, they have made no argument that the trial court erred in granting summary judgment on that claim. Therefore, it is deemed abandoned. Court of Appeals Rule 25 (c) (2).

*Case No. A12A1604*

6. The plaintiffs contend that the trial court erred in granting summary judgment in favor of TLC on the plaintiffs' claim for tortious interference with a fiduciary relationship, also referred to by the plaintiffs as either "aiding and abetting a breach

---

[25] See footnote 15, supra.

of fiduciary duty" or "conspiracy to breach a fiduciary duty."[26] For the following reasons, we agree.

A plaintiff may recover for tortious interference with a fiduciary duty upon proof of the following elements:

> (1) through improper action or wrongful conduct and without privilege, the defendant acted to procure a breach of the primary wrongdoer's fiduciary duty to the plaintiff; (2) with knowledge that the primary wrongdoer owed the plaintiff a fiduciary duty, the defendant acted purposely and with malice and the intent to injure; (3) the defendant's wrongful conduct procured a breach of the primary wrongdoer's fiduciary duty; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

(Citations and footnotes omitted.) *Insight Technology v. FreightCheck*, 280 Ga. App. 19, 25-26 (1) (a) (633 SE2d 373) (2006).

In this case, to establish the "improper action or wrongful conduct" element of their tort claim, the plaintiffs rely upon allegations that TLC's officers and Board of Directors conspired with the trustees to induce the income beneficiaries to sell their

---

[26] The plaintiffs have made no legal argument concerning the grant of summary judgment to TLC on any of their remaining claims. Therefore, any claim of error concerning any other aspect of the court's grant of summary judgment to TLC is deemed abandoned. Court of Appeals Rule 25 (c) (2).

34

stock to TLC at a discount, in violation of the terms of the trust agreement. Here, we find sufficient evidence from which a jury might infer that TLC – through some of its officers and the majority of its directors – knowingly aided and abetted the trustees in the alleged breach of their fiduciary duties.[27] First, there is some evidence that the stock was undervalued. TLC provided the documents that Stanley used to value the stock, and the defendants concede that the valuation may not have taken into account the full value of some of TLC's assets or holdings. Second, there is evidence from which a jury could infer that TLC was secretive about its intent to purchase the stock to discourage other potential buyers. Specifically, Watts deposed that the proposed sale was concealed from Billy and from the public so that others would not spoil the deal. Under these circumstances, the trial court erred in granting summary judgment

---

[27] "[K]nowledge of officers of a corporation is knowledge to that corporation and the corporation is bound thereby." *Stein Steel & Supply Co. v. Franco*, 148 Ga. App. 186, 188 (251 SE2d 74) (1978).

in favor of TLC on the plaintiffs' claim for tortious interference with a fiduciary relationship. See id. at 26 (1) (b).

*Judgments affirmed in Case Nos. A12A1603 and A12A1607; affirmed in part and reversed in part in Case No. A12A1606; and reversed in Case Nos. A12A1602, A12A1604, and A12A1605. Phipps, P. J., concurs and Dillard, J., concurs dubitante in judgment only*.

A12A1602. NALLEY et al. v. LANGDALE.

A12A1603. NALLEY et al. v. LANGDALE .

A12A1604. NALLEY et al. v. THE LANGDALE COMPANY.

A12A1605. NALLEY et al. v. LANGDALE.

A12A1606. NALLEY et al. v. LANGDALE.

A12A1607. LANGDALE v. NALLEY et al.

DILLARD, Judge, concurring *dubitante* in judgment only.

I concur in today's result. I concur because I cannot say with confidence that my colleagues on the panel are incorrect in the manner they have chosen to resolve the issues before us. But I do so with serious doubts.[1] And if I were deciding this case alone, my reasoning and conclusions might differ from the majority's in several material respects. That said, I am satisfied that my colleagues have carefully and seriously studied this case. Chief Judge Ellington has penned a thoughtful opinion in which Presiding Judge Phipps has fully concurred. I commend them both for the

---

[1] *See generally United States v. Kaley*, 677 F3d 1316, 1330-32 (11th Cir. 2012) (Edmonson, J., concurring in the result); *Benefield v. Tominich*, 308 Ga. App. 605, 613 (708 SE2d 563) (2011) (Blackwell, J., concurring dubitante); Jason J. Czarnezki, *The Dubitante Opinion*, 39 Akron L. Rev. 1 (2006).

amount of time and effort they have exerted in resolving this difficult and important case. Unfortunately, our constitutional duty to resolve this appeal today (within two terms of docketing)[2] precludes me from engaging in the type of extended study necessary to achieve a high degree of confidence that my experienced, able colleagues are right.[3] As such, I defer to the conclusions they have reached in this case, albeit with considerable reservations.

---

[2] Ga. Const. art. VI, § 9, ¶ 2 ("The Supreme Court and the Court of Appeals shall dispose of every case at the term for which it is entered on the court's docket for hearing or at the next term.").

[3] The parties to this appeal are represented by talented and skillful attorneys who have vigorously advanced their clients' interests throughout this unique and complex piece of litigation—so much so that their considerable efforts have produced a staggering appellate record consisting of *eighty* parts (and thousands upon thousands of pages), six transcripts, and numerous lengthy and detailed briefs. It is in this context that I suggest extended study on my part would be required in order for me to achieve a high degree of confidence that my distinguished colleagues are correct in the reasoning outlined in their majority opinion, as well as in the conclusions they have reached.