[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-12723
_____

D.C. Docket No. 1:12-cv-02422-SCJ

THE LANGDALE COMPANY,

Plaintiff-Appellant,

versus

NATIONAL UNION FIRE
INSURANCE COMPANY OF
PITTSBURGH, PENNSYLVANIA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(June 22, 2015)

Before WILLIAM PRYOR and JORDAN, Circuit Judges, and ROSENTHAL,[*]
District Judge.

---

[*] Honorable Lee H. Rosenthal, United States District Judge for the Southern District of
Texas, sitting by designation.

PER CURIAM:

Mixing family and family-owned business can be complicated. When the mix produces litigation, complications can multiply. When the litigation involves misconduct allegedly committed by family members serving simultaneously as officers of the family business and as trustees of the family trust holding large amounts of the company's stock, the complications abound. Add the question of insurance coverage for the litigation to the mix, and you have this case.

We are asked to decide whether the district court erred in finding no coverage under a director's and officer's ("D&O") insurance policy for claims asserted by beneficiaries of a family trust against their family-owned corporation and against two individual family members who served simultaneously as directors or officers of the corporation and as trustees of the trust. The beneficiaries alleged violations of duties owed to and by the corporation, and violations of duties owed to the trust. The D&O policy excluded coverage for alleged misconduct committed in a capacity other than as a corporate officer or director. The issue is whether the underlying lawsuits alleged misconduct that was covered or that was excluded from coverage.

Plaintiff-Appellant The Langdale Company ("TLC") sued its D&O insurer, the National Union Fire Insurance Company ("National Union"), for denying coverage and refusing to advance defense costs incurred in litigation filed in the

2

Georgia state court.    The district court granted National Union's summary judgment motion, and TLC appealed.  We find that the district court did not err, and we affirm.

## I.  BACKGROUND

A court determines whether there was D&O coverage triggering a duty to advance defense costs by looking to the allegations in the underlying lawsuits.[1] The pleadings filed in the underlying litigation recount the family history.  In 1947, Judge Harley Langdale, Sr., incorporated The Langdale Company, known as TLC. It "functions as a holding company for subsidiaries that conduct a number of businesses (including forest products, auto dealerships, and banks)."  *Nalley v. Langdale*, 734 S.E.2d 908, 910 n.1 (Ga. Ct. App. 2012).  Its "assets include substantial tracts of timberland."  *Id.*  Judge Langdale kept 25 percent of the stock and gave an equal amount to each of his three sons, John, Billy, and Harley, Jr.

In 1959, Judge Langdale created the Virginia Miller Langdale Family Trust for the benefit of his daughter and her children.  Judge Langdale transferred his 25-

---

[1]  *See Penn-America Ins. Co. v. Disabled Am. Veterans, Inc.*, 490 S.E.2d 374, 376 (Ga. 1997) (directing courts to look to "the allegations of the complaint against the insured" to "determine whether a liability covered by the policy is asserted" (alterations and emphasis omitted)); *George L. Smith II Ga. World Congress Ctr. Auth. v. Miller Brewing Co.*, 566 S.E.2d 361, 363 (Ga. Ct. App. 2002) (distinguishing the "duty to indemnify . . . for liabilities and claims of liability" from "the legally separate duty to defend . . . or to pay for expenses of litigation or attorney fees").

percent interest in TLC to the Trust, and the Trust beneficiaries received the TLC stock dividends. Judge Langdale's sons, Harley and John, were the trustees.

In 1992, Judge Langdale's grandson, Johnny, became TLC's chief executive officer. Two years later, while still serving as TLC's CEO and as a director, Johnny Langdale replaced his ailing father, John, as a trustee for the Virginia Miller Trust. His uncle, Harley Langdale, also a TLC director, remained as the other trustee. The Trust still held 24.8 percent of TLC's outstanding voting stock.[2] Of the remaining TLC voting shares, Johnny Langdale and his father jointly owned 25 percent; Harley, Johnny's uncle and co-trustee, owned 25 percent; and Billy, his other uncle, owned 25 percent. Johnny and Harley Langdale were the only trustees.

In May 2009, the Trust beneficiaries sued Johnny and Harley Langdale in Georgia state court. *See Langdale Miller Nalley, et al. v. John W. Langdale, Jr.; Harley Langdale, Jr.; and John W. Langdale Jr., as Executor of the Estate of John W. Langdale, Sr.*, Civil Action No. 2009-CV-1343, Superior Court of Lowndes County, Georgia. They asserted several claims: (1) breach of trust; (2) breach of fiduciary duty to the Trust beneficiaries; (3) breach of fiduciary duty as directors of TLC to the company's minority shareholders, the Trust beneficiaries ("Count III");

---

[2] Another trust, established by Judge Langdale's 1970 will for the benefit of John and Billy Langdale's children, held 0.19 percent.

4

(4) fraud; (5) constructive trust; (6) conspiracy; (7) attorneys' fees; and (8) equitable relief.

The beneficiaries' state-court complaint alleged that beginning in 1994, Johnny and Harley Langdale "embarked on a scheme" to consolidate "their control over TLC" by "hav[ing] TLC redeem the Trust's stock" in TLC "at an absurdly low price."  [R. 77-52, at 31.]  The scheme was implemented in 1997, when Virginia Langdale Miller was engaged in her own estate planning.  Johnny and Harley Langdale allegedly told Virginia Langdale Miller that the Trust would terminate on December 31, 1999.  This was false; the Trust did not have an end date.  Because terminating the Trust would result in distributing TLC's shares— rather than merely the dividend income—to Virginia Langdale Miller and her children, a termination date would create estate-planning and tax problems for them.  Johnny and Harley Langdale also allegedly made statements about the stock's limited liquidity and value.  The beneficiaries allege that these statements were false as well.  They allege that based on the false information about the Trust termination date and the problems they faced in selling their stock, Virginia Langdale Miller and the other Trust beneficiaries agreed to sell their shares back to TLC for "only a fraction of [their] real value."  [R. 77-52, at 33.]

On May 27, 1999, Johnny Langdale resigned as a trustee of the Trust.  He continued serving as a TLC corporate officer and director.  The next day, Johnny

5

Langdale, acting as TLC's chief executive officer, signed a Redemption Agreement that allowed TLC to purchase all of the Trust's Class A voting shares and roughly 20 percent of the Trust's Class B non-voting shares. Harley Langdale, acting as trustee, signed for the Trust. That same day, Harley Langdale executed an Option Agreement that allowed him to purchase the remaining 80 percent of the Trust's Class B non-voting shares at a later date. On January 28, 2000, Harley Langdale assigned his rights under the Option Agreement to TLC, which purchased the Trust's remaining Class B non-voting shares. The Trust beneficiaries received "approximately $27 million for the Trust's stock in TLC." [R. 77-52, at 45.] The stock they sold was allegedly "worth well over $150 million in 1999." [R. 77-52, at 45.]

According to the complaint, Johnny and Harley Langdale had caused TLC to adopt a Shareholders' Agreement that gave TLC the right to redeem any stock the Trust wanted to sell to a third party before the Trust could make the sale. The Agreement set the redemption price; the complaint alleged that it was far below the stock's value. The complaint alleged that Johnny and Harley Langdale "used their systemic refusal to pay income to the beneficiaries, their knowledge of estate planning problems caused by the belated revelation that the Trust would terminate in 1999, and their ability to persuade the beneficiaries that the 'Shareholders' Agreement' applied to TLC's redemption or purchase of the Trust's stock to

6

induce Virginia Langdale Miller and her children to sign documents 'consenting' to the transfer of the Trust's stock to TLC" at this unfair price.  [R. 77-52, at 33.] The complaint also alleged that Harley and Johnny Langdale hid what they did and said to the Trust beneficiaries from the TLC Board of Directors because they feared that their fellow directors, Billy and Robert Langdale, would alert the Virginia Langdale Miller Trust beneficiaries that they were about to sell their stock to TLC at a price far below fair market value.

TLC held an insurance policy with D&O coverage from National Union. The policy required the insurer to advance defense costs for, and indemnify TLC against, lawsuits seeking damages for the wrongful acts of its directors and officers committed in that capacity.  The policy provided four types of D&O coverage. Two, Coverage A and Coverage B, are relevant here.  Those policy provisions state as follows:

**COVERAGE A: INDIVIDUAL INSURED INSURANCE**
This D&O Coverage Section shall pay the Loss of an Individual Insured [an employee, executive, or outside entity executive] of the Company [TLC] arising from a Claim made against such Individual Insured for any Wrongful Act of such Individual Insured, except when and to the extent that the Company [TLC] has indemnified such Individual Insured. The Insurer [National Union] shall, in accordance with and subject to Clause 7 of this D&O Coverage Section, advance Defense Costs of such Claim prior to its final disposition.

**COVERAGE B: PRIVATE COMPANY INSURANCE**
This D&O Coverage Section shall pay the Loss of the Company [TLC] arising from a:

(i)   Claim made against the Company [TLC], or

(ii)  Claim made against an Individual Insured [an employee, executive, or outside entity executive],

for any Wrongful Act but, in the case of Coverage B(ii) above, only when and to the extent that the Company [TLC] has indemnified the Individual Insured for such loss. The Insurer [National Union] shall, in accordance with and subject to Clause 7 of this D&O Coverage Section, advance Defense Costs of such Claim prior to its final disposition.

. . . .

[R. 52-1, at 20 (emphasis omitted).]  The policy defined a covered "Wrongful Act"

in two ways:

(i) with respect to any Executive or Employee of a Company, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by such Executive or Employee in their respective capacities as such, or any matter claimed against such Executive or Employee of a Company solely by reason of his or her status as an Executive or Employee of a Company; and

(ii) with respect to a Company, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by a Company.[3]

[R. 52-1, at 24–25 (emphasis omitted).]

The policy required National Union to "advance . . . Defense Costs prior to

the final disposition of a Claim," on the Insured's written request.  National Union

---

[3] The policy provided a third definition for Wrongful Acts committed "with respect to service on an Outside Entity."  [R. 52-1, at 25 (emphasis omitted).]  Neither TLC nor National Union contends that this definition applies; the Trust is not an "Outside Entity" under the policy.

8

could "withhold consent to any . . . Defense Costs . . . to the extent such Loss is not covered under" either Coverage A or B.  [R. 52-1, at 30–31 (emphasis omitted).]

TLC sought defense costs under the policy based on the director-misconduct allegations in Count III of the beneficiaries' state-court complaint.  Count III alleged that Johnny Langdale breached the fiduciary duties he owed TLC as a director.  Johnny Langdale sought and received indemnification from TLC, which paid all the fees incurred in the underlying suit.

TLC had filed a separate action in Georgia state court against the Trust beneficiaries, seeking a declaratory judgment that TLC held clear title to certain company stock.  *See The Langdale Company v. Harley Langdale, Jr. et al.*, Civil Action No. 2009-CV-2747, Superior Court of Lowndes County, Georgia.  On November 13, 2009, the Virginia Miller Trust beneficiaries filed an answer and counterclaim against TLC (the "TLC counterclaim") in the separate action.  The TLC counterclaim asserted claims for: (1) fraud; (2) conspiracy; (3) tortious interference with fiduciary duties and aiding and abetting breach of trust and fiduciary duties; (4) receipt of Trust property with knowledge of the breach of trust; (5) TLC's *respondeat superior* liability for its officers' misconduct ("Count V"); (6) attorneys' fees; and (7) equitable relief.  The TLC counterclaim alleged that TLC had aided and abetted Johnny and Harley Langdale in misrepresenting

9

the value of the beneficiaries' stock and their need to sell it to the company, and that TLC was liable for its officers' misconduct.

TLC demanded advance payment of the costs to defend against the allegations in Count III of the state-court complaint that Johnny Langdale had breached the fiduciary duties he owed TLC as an officer and director. On November 12, 2009, National Union denied coverage. It cited Exclusion 4(g), which applies to any claim "alleging, arising out of, based upon or attributable to" TLC directors' or officers' "actual or alleged act[s] or omission[s]" in any capacity other than as a director or officer of TLC.[4]  [R. 52-1, at 25–26; *see also* R. 52-11.]

TLC also demanded advance payment of the costs to defend against the allegations in Count V of the counterclaim that TLC was vicariously liable for the misconduct by its officers and directors, Johnny and Harley Langdale. National Union denied coverage, asserting that Exclusion 4(g) applied because the counterclaim "arose out of" Johnny Langdale's actions in his capacity as trustee, not as an officer or director of TLC.

The beneficiaries' state-court complaint and the TLC counterclaim were consolidated into one action in Georgia state court, referred to together as the "the

---

[4] National Union also cited another exclusion, Endorsement 15, but the parties agree that it was not part of the policy during the relevant period.

underlying litigation."  In April 2011, the state court granted Johnny Langdale's motion for summary judgment and dismissed the claims against him.[5]

TLC again sought the costs it had spent obtaining the summary judgment dismissing the Trust beneficiaries' claims against Johnny Langdale.  National Union denied the claim, citing not only Exclusion 4(g) but also Endorsement 8 and Exclusion 4(d).  These provisions exclude coverage for claims that arise out of, are attributable to, or are related to, events that are either: (1) specifically listed and excluded in Endorsement 8; or (2) were previously tendered to an insurance carrier.  According to National Union, the complaint and the counterclaim related to allegations raised in a 2008 state court suit and a 2008 federal court suit that other Langdale family members had filed against Johnny Langdale.[6]

In July 2012, Johnny Langdale and TLC sued National Union in federal district court based on diversity jurisdiction.  They sought (1) damages for breach of the insurance contract, (2) a declaratory judgment that National Union had a

---

[5] The Georgia Court of Appeals reversed this decision in part.  *See Nalley*, 734 S.E.2d at 920–21.

[6] National Union at one point offered to advance defense costs for only Count III of the state-court complaint and Count V of the TLC counterclaim.  The record does not reveal whether TLC accepted this offer, but TLC does not argue that National Union waived, or should be estopped from asserting, Exclusion 4(g).  *See* Aplt. Br. at 35; *see also* Oral Arg. Recording at 7:17–45 (counsel for TLC acknowledging that the panel may affirm only if it agrees with the district court that Exclusion 4(g) precluded coverage), 17:25–37 (discussion with counsel for National Union regarding TLC's failure to raise waiver or estoppel with respect to Exclusion 4(g)).

11

duty to advance defense costs, and (3) damages for National Union's bad faith. Georgia law applied.

After discovery, both parties moved for summary judgment, TLC on its claims for breach of contract and a declaratory judgment, and National Union on all claims. TLC argued that National Union had waived reliance on, or was estopped from invoking, Endorsement 8 and Exclusion 4(d) to deny coverage because it had failed to identify these grounds in its initial denial letter. National Union argued that it could raise both because the duty to advance costs differed from the duty to defend and because belated assertion did not result in waiver or forfeiture. National Union also argued that Exclusion 4(g), which it did initially invoke, separately precluded coverage.

In a thorough and careful opinion, the district court granted National Union's motion for summary judgment and denied TLC's cross-motion. The court agreed with TLC that National Union's obligation to advance defense costs was the same obligation as a duty to provide a defense, and that TLC had met its initial burden to show coverage. The court also agreed with National Union that it could rely on all three policy exclusions and had met its burden to show that all three precluded coverage. The court held that under the leading Georgia case, *Hoover v. Maxum Indem. Co.*, 730 S.E.2d 402 (Ga. 2012), National Union's failure to raise Endorsement 8 or Exclusion 4(d) in the initial denial-of-coverage letter did not

result in waiver because these were coverage defenses, not policy defenses. That is, National Union invoked Endorsement 8 and Exclusion 4(d) to argue that the D&O policy did not cover the claims in the underlying litigation, not to argue that the insureds failed to fulfill a procedural requirement for coverage that would otherwise apply.

The district court held that Exclusion 4(g), which National Union had timely asserted, applied and excluded coverage. The court followed Georgia cases holding that the phrase "arising out of" in a policy exclusion triggers the but-for causation standard used to decide cause-in-fact tort liability. Under this standard, a court deciding coverage looks to the "'underlying facts and circumstances of the claims asserted to determine whether or not a policy exclusion applies.'" [R. 110, at 47 (quoting *Hays v. Ga. Farm Bur. Mut. Ins. Co.*, 722 S.E.2d 923, 927 (Ga. Ct. App. 2012) (citations omitted)).] That determination turns on the "'genesis of the underlying plaintiff's claims.'" [*Id.* (quoting *Hays*, 722 S.E.2d at 927).] "'[T]he exclusionary clause is focused solely upon the genesis of the underlying plaintiff's claims—if those claims arose out of the excluded acts . . . then coverage need not be provided. Claims arise out of [t]he excluded conduct when 'but for' that conduct, there could be no claim against the insured.'" [*Id.* (quoting *Hays*, 722 S.E.2d at 927).] The district court reviewed the pleading allegations in the

underlying litigation and held that "the genesis of the underlying plaintiffs' claims involve[s] the acts of the trustees."  [*Id.*]

The district court explained that:

> the Claims (or allegations of wrongdoing) against [TLC] and Johnny [Langdale] would not have occurred but for the acts (in the form of breach of fiduciary duty) of the trustees.  Because the insurance policy specifically excludes any claim "arising out of" an act of an Insured serving in any capacity other than as an Executive/Employee, National Union had no duty to advance defense costs to Johnny [Langdale] or to [TLC].
>
> To the extent that the Underlying Litigation includes Count Three of the [beneficiaries' complaint against Harley and Johnny Langdale,] titled "Breach of Fiduciary Duty of Director," several allegations specifically directed to [Johnny] Langdale's conduct as an officer and director of [TLC], and [] Count V [of the beneficiaries' counterclaim against TLC], alleging "Respondeat Superior Liability of [TLC] for its Officers' Misconduct," the conclusion does not change, as the facts that gave rise to these causes of action arose out of the trustee's alleged wrongful actions.  These counts/allegations are within the policy exclusion of 4(g) . . . [and TLC's] arguments focusing on the individual counts in the complaint and the acts of the officers is not determinative, as "the Exclusion is worded as excluding the Claim—not individual acts," and the "term Claim is defined as 'a civil . . . proceeding for monetary . . . relief which is commenced by service of a complaint or similar pleading.'"

[R. 110, at 47–48 (quoting R. 85, at 4).]  The district court went on to hold that Endorsement 8 and Exclusion 4(d) also barred coverage for the claims asserted in

14

the underlying litigation.  The district court granted summary judgment to National Union on all of TLC's claims.

TLC timely appealed.  We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## II.  THE LEGAL STANDARDS

We "review[] the district court's disposition of cross-motions for summary judgment *de novo*, applying the same legal standards used by the district court, viewing the evidence and all factual inferences therefrom in the light most favorable to the non-movant, and resolving all reasonable doubts about the facts in favor of the non-moving party."  *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).

Under Georgia law, "whether an insurer has a duty to defend depends on the language of the policy as compared with the allegations of the complaint.  If the facts as alleged in the complaint even arguably bring the [claim] within the policy's coverage, the insurer has a duty to defend the action."  *Hoover*, 730 S.E.2d at 418 (internal quotation marks and citation omitted).  "Where the claim is one of potential coverage, doubt as to liability and [the] insurer's duty to defend should be resolved in favor of the insured."  *Perur-Am. Ins. Co.*, 490 S.E.2d at 376 (internal quotation marks omitted).  "[T]o excuse the duty to defend[,] the [complaint] must unambiguously exclude coverage under the policy."  *BBL-McCarthy, LLC v.*

15

*Baldwin Paving Co.*, 646 S.E.2d 682, 685 (Ga. Ct. App. 2007) (quotation omitted). "[A]n insurer has a correlative duty to defend its insured against all claims covered under a policy, even those that are groundless, false, or fraudulent." *So. Guar. Ins. Co. v. Dowse*, 605 S.E.2d 27, 29 (Ga. 2004).

"[A]n insurer seeking to invoke a policy exclusion carries the burden of proving its applicability in a given case." *First Specialty Ins. Corp., Inc. v. Flowers*, 644 S.E.2d 453, 455 (Ga. Ct. App. 2007). "Exclusions from coverage are to be strictly construed, and '[i]t is the understanding of the average policyholder which is to be accepted as a court's guide to the meaning of words, with the help of the established rule that ambiguities and uncertainties are to be resolved against the insurance company.'" *Fidelity Nat'l Title Ins. Co. v. Keyingham Invs., LLC*, 702 S.E.2d 851, 853 (Ga. 2010) (quoting *Cunningham v. Middle Ga. Mut. Ins. Co.*, 601 S.E.2d 382, 386 (Ga. Ct. App. 2004)). "An insurer can carry its burden of showing that a policy exclusion applies by relying exclusively upon the allegations against the insured in the underlying complaint." *First Specialty Ins.*, 644 S.E.2d at 455. "If the insurer meets its burden, 'the burden then shifts to the [insured] to come forward with other evidence creating a genuine issue of fact over whether the exclusion is applicable.'" *Id.* at 455 n.2 (quoting *St. Paul Reinsurance Co., Ltd. v. Ross et al.*, 622 S.E.2d 374, 378 (Ga. Ct. App. 2005)) (alteration in original).

16

## III. DISCUSSION

TLC argues that the district court made three errors. The first error was finding that National Union could rely on the two policy exclusions it had failed to invoke in its initial coverage-denial letters. Second, the court erred in finding that all three asserted exclusions precluded coverage for TLC's claims. Finally, the court erred in finding that TLC's bad-faith claim failed as a matter of law. We find that National Union timely and properly denied coverage under Exclusion 4(g), the sole policy exclusion that it did identify in its initial letters denying coverage. We need not and do not decide whether the district court erred in concluding that National Union could rely on the two additional exclusions. Because coverage was properly denied, National Union did not act in bad faith.

### A.    Exclusion 4(g)

Exclusion 4(g) provides:

> The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured:
> . . . .
>> (g) alleging, arising out of, based upon or attributable to any actual or alleged act or omission of an Individual Insured serving in any capacity, other than as Executive or Employee of a Company, or as an Outside Entity Executive of an Outside Entity.

[R. 52-1, at 25–26 (emphasis omitted).] The district court concluded that this provision excluded TLC's claim for coverage and advancement of defense costs. The court ruled that the genesis of the allegations in the state-court complaint and

17

in the TLC counterclaim arose out of alleged wrongdoing by Johnny and Harley Langdale as the Virginia Miller Trust's trustees, rather than as TLC's directors or officers. TLC argues that the district court erred by interpreting Exclusion 4(g) to apply to allegations of corporate, rather than merely individual, wrongdoing; reading "Claim" too broadly; and misapplying Exclusion 4(g)'s "arising out of" language.

### 1.  The Argument that Exclusion 4(g) Does Not Apply

TLC contends that Exclusion 4(g) applies only to claims against a company's individual directors or officers, not to claims against the company itself. Coverage A provides "Individual Insured Insurance" and Coverage B provides "Private Company Insurance." [R. 52-1, at 20.] Coverage B is divided into B(i), providing coverage for claims "made against the Company," and (B)(ii), for claims "made against an Individual Insured." [*Id.*] TLC asserts that Exclusion 4(g) applies only to claims made under Coverage A or Coverage B(ii), but not under Coverage B(i). TLC argues that "Exclusion 4(g) has no field of operation as to TLC when allegations are made directly against TLC" because it could be "potentially liable only if its" executives or employees "were acting in their capacity as such." Aplt. Br. at 26. TLC argues that because it indemnified Johnny Langdale in the suit the Trust beneficiaries filed against him, and because TLC was itself sued in the counterclaim the beneficiaries filed, the defense costs it incurred

18

were to defend against allegations that it—not just Johnny Langdale—committed wrongful acts.   TLC contends that Exclusion 4(g), which applies only to allegations of wrongdoing by individual directors or officers such as Johnny and Harley Langdale, simply does not apply.  We disagree.

Exclusion 4(g) does not distinguish between claims that fall under Coverage A or under Coverage B.  Nor does it distinguish between claims under the two Coverage B subparts.  Exclusion 4(g) excludes coverage for "any Claim" made against "an Insured," such as TLC, arising out of the alleged wrongdoing by "an Individual Insured," such as Johnny or Harley Langdale, committed in any capacity other than as a director or officer.  The policy does not state that Exclusion 4(g) applies only to coverage for individuals under Coverage A, only to claims against the insured Company under Coverage B(i), or only to claims against an Individual Insured under Coverage B(ii).  By contrast, a separate exclusion, Exclusion 4(t), is expressly limited to "Coverage B(i) only."  [R. 52-1, at 29.]  A "reasonable person in [TLC's] position would [not] understand" that the policy limited Exclusion 4(g) to specific coverage categories.  *See Am. Strategic Ins. Corp. v. Helm*, 759 S.E.2d 563, 566 (Ga. Ct. App. 2014).

And, in any event, TLC based its claim for defense costs under the policy on the state-court complaint allegations that Johnny Langdale had committed wrongful acts as a trustee of the Virginia Langdale Miller Trust and as a TLC

19

officer and director.  Exclusion 4(g) excludes coverage for the claims against Johnny and Harley Langdale based on the acts they allegedly committed in capacities other than as TLC officers or directors.  Exclusion 4(g) also applies to exclude coverage for claims against TLC itself, so long as those claims arise out of the alleged acts Johnny and Harley Langdale committed as trustees of the Virginia Miller Langdale Trust.

## 2. The Argument that Each Cause of Action is a "Claim"

TLC argues that the district court interpreted the term "Claim" too broadly by treating the claims in the consolidated underlying litigation as a single "Claim." *See* Aplt. Br. at 29 (arguing that it is "nonsensical for an entire lawsuit to constitute a single claim when applying a claims-made policy").  TLC argues that the policy language and Georgia law required the court to treat each cause of action as a separate "Claim" for the purpose of Exclusion 4(g).  According to TLC, because National Union had the duty to defend at least one claim alleged in the complaint or counterclaim, it had the "duty to defend all the claims asserted."  *See HDI-Gerling Am. Ins. v. Morrison Homes, Inc.*, 701 F.3d 662, 666 (11th Cir. 2012).  TLC contends that the district court's overly broad approach to claims led it to ask whether the litigation as a whole arose out of allegations that Johnny and Harley Langdale committed wrongful acts as trustees rather than as TLC officers or directors.  TLC argues that this is the wrong question and that the right question is

20

whether the specific claims the Trust beneficiaries asserted against TLC arose out of TLC's own alleged wrongful acts or only out of Johnny and Harley Langdale's alleged wrongful acts as TLC officers or directors as well as trustees of the Trust.

The policy defines "Claim" as: (i) "a written demand for monetary or non-monetary relief (including any request to toll or waive any statute of limitations); (ii) "a civil . . . proceeding for monetary . . . relief which is commenced by . . . service of a complaint or similar pleading"; or (iii) "a civil, criminal, administrative or regulatory investigation of an Individual Insured."  [R. 52-1, at 21 (emphasis omitted).][7]  The policy language provides some support for both parties' arguments, but we need not resolve this question.  Even accepting TLC's narrower interpretation of "Claim," the district court did not err in holding that Exclusion 4(g) precluded coverage.  *See Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006) ("We may affirm the [d]istrict [c]ourt on any basis supported by the record.").  As discussed below, even if each cause of action is treated as a separate "Claim" for the purpose of applying Exclusion 4(g), both Count III of the state-court complaint and Count V of the counterclaim "arose out of" allegations that Johnny and Harley Langdale committed wrongful acts as trustees of the Trust.

### 3. The Argument that the Causes of Action for Officer or Director Misconduct Did Not "Arise Out Of" Johnny and Harley Langdale's Alleged Wrongful Acts as Trustees

---

[7] The term also "include[s] any Securities Claim and any Derivative Demand."  [R. 52-1, at 21.]

21

"When the phrase 'arising out of' is found in an exclusionary clause of an insurance policy, [Georgia courts] apply the 'but for' test traditionally used to determine cause-in-fact for tort liability." *Hays*, 722 S.E.2d at 927 (quoting *Barrett v. Nat. Union Fire Ins. Co., etc.*, 696 S.E.2d 326, 331–32 (Ga. Ct. App. 2010)). "[T]he exclusionary clause is focused solely upon the genesis of the underlying plaintiff's claims—if those claims arose out of the excluded acts . . . then coverage need not be provided. Claims arise out of [t]he excluded conduct when 'but for' that conduct, there could be no claim against the insured." *Id.* (internal quotation marks omitted). A "claim does not 'arise out of' a circumstance if, independent of that circumstance, the claim could still exist." *USMoney Source, Inc. v. Am. Int'l Specialty Lines Ins. Co.*, 288 F. App'x 558, 560 (11th Cir. 2008) (internal quotation marks omitted).

Count III of the state-court complaint sought damages for Johnny and Harley Langdale's breaches of the fiduciary duties they owed as TLC directors to TLC's minority shareholders, the Trust beneficiaries. Count III alleged that Johnny and Harley Langdale "had documents created and caused the execution of agreements that granted Harley [Langdale] the right to purchase TLC stock both from the Trust itself and from the beneficiaries individually" and "induced the beneficiaries to grant those rights." [R. 77-52, at 73–74.] Count III alleged that Johnny and Harley Langdale "were personally enriched" by TLC's 1999 and 2000 redemption of the

22

beneficiaries' shares that had been held in the Trust, and that they "failed to deal fairly with the beneficiaries" by "fail[ing] to disclose" and "deliberately conceal[ing] critical information." [*Id.* at 74.]

Count V of the counterclaim sought to hold TLC vicariously liable "for its officers' misconduct." [R. 77-53, at 91.] Like Count III of the complaint, Count V of the counterclaim alleged that Harley and Johnny Langdale, and Johnny's father, John Sr., breached the fiduciary duties they owed as TLC directors and officers to the Trust beneficiaries by engaging in self-dealing; and by failing to disclose material information to, and by deliberately concealing critical information from, the beneficiaries, relating to TLC's adoption of the Shareholders' Agreement and the Redemption Agreement, and to the redemption transaction itself.

Both the self-dealing and the misrepresentation causes of action arose out of Johnny and Harley Langdale's alleged breaches of their duties as trustees. The state-court complaint and the counterclaim alleged that, beginning in the early to mid-1990s, "[t]he Trustees and TLC embarked on a scheme . . . to make the Trustees' control over TLC permanent, to have TLC redeem the Trust's stock, and to do so at an absurdly low price." [R. 77-53, at 37.] The alleged scheme included: (1) causing TLC to adopt a Shareholders' Agreement to enable the company to redeem the Trust's stock at a favorable price before the Trust beneficiaries could sell their stock to third parties; (2) misrepresenting the Trust's

23

termination date to convince the beneficiaries to sell by 1999 to avoid potentially devastating estate and tax consequences; (3) telling the beneficiaries that Johnny and Harley Langdale would not take any action as TLC directors to increase the dividends or liquidity of TLC stock; (4) telling the beneficiaries that there was no market for their TLC stock because it represented only a minority interest; (5) hiding the redemption of the beneficiaries' stock from the co-directors, Billy and Robert Langdale, so that they could not tell the beneficiaries truthful information before the plan was executed; and (6) terminating the Shareholders' Agreement after the stock was redeemed so that Johnny Langdale could purchase Harley Langdale's voting stock "without having to first offer that stock to TLC or other shareholders." [R. 77-53, at 38–39; *see also* R. 77-52, at 31–32, 41–42.]

According to the counterclaim, "[e]ach of these acts were part and parcel of the Trustees' fraudulent scheme to obtain 2/3 control of TLC by . . . redeeming the stock at an absurdly low price, in which scheme TLC was fully complicit." [R. 77-53, at 39.] The counterclaim alleged that "[t]he Trustees and TLC were complicit in the scheme to breach the Trustee's [sic] duties to the beneficiaries by procuring adoption of the 'Shareholders' Agreement.'" [R. 77-53, at 51.] The counterclaim alleged that Johnny and Harley Langdale "did not inform Virginia and her surviving children that they had initiated adoption of the 'Shareholders' Agreement,'" which Johnny and Harley "signed [as trustees] . . . on the

24

beneficiaries' behalf." [R. 77-52, at 37.] Nor did Johnny and Harley Langdale inform their co-directors, Billy and Robert Langdale, "about the purpose of the 'Shareholders' Agreement' or their plans to use it and then terminate it." [R. 77-52, at 37.]

The counterclaim also alleged that Johnny and Harley Langdale's misrepresentation to the Trust's beneficiaries that "the Trust terminated in 1999, with the attendant estate tax consequences to Virginia, was the very premise on which the sale of the Trust's stock to TLC was based." [R. 77-53, at 47.] "Without the misrepresentation about termination in 1999," the counterclaim alleged, "the beneficiaries would not have consented to the sale of the stock, thus thwarting the Trustees' scheme to cheat the beneficiaries and gain total control of TLC." [*Id.*]

The counterclaim allegations include statements that Johnny and Harley Langdale acted in their capacities as TLC officers and directors in carrying out the scheme that resulted in the Trust beneficiaries selling their TLC stock to the company at the redemption price. But the pleadings make it clear that Johnny and Harley Langdale's alleged misconduct as officers and directors necessarily arose out of their alleged breaches of the fiduciary duties they owed as trustees to the Trust beneficiaries. The underlying litigation pleadings confirm that the allegations against the Langdales in their capacities as TLC officers and directors

25

arose out of actions they took in their capacities as trustees. Both the state-court complaint and the counterclaim alleged that "[e]very action undertaken by the Trustees or any of them with respect to the Trust or which affected the Trust or the Trust's stock in TLC or the interests of the beneficiaries was necessarily a matter connected to the Trustees' role as a trustee [sic], which invoked the Trustee's [sic] fiduciary duty." [R. 77-53, at 68; *see also* R. 77-52, at 56.]

The underlying litigation allegations describe TLC's financing of the transaction redeeming the Trust beneficiaries' TLC stock. Count III of the state-court complaint alleged that "[b]uying the Trust's stock themselves would cost [Johnny and Harley Langdale] money. But if TLC redeemed the Trust's stock, then [Johnny and Harley Langdale] would have permanent control over TLC because they would control two-thirds of the outstanding voting stock, at no cost" to themselves. [R. 77-52, at 30.] "Every dollar saved by TLC in purchasing the trust's stock—and every dollar denied to the beneficiaries—redounded to Johnny[] and Harley [Langdale's] own individual benefit, because each of them had a one-third interest in that dollar saved." [R. 77-52, at 34.] Count V of the Trust beneficiaries' counterclaim against TLC alleged that it was vicariously liable for Johnny and Harley Langdale's misconduct as TLC officers and directors.

The allegations against TLC in Count III of the beneficiaries' state-court complaint and Count V of the counterclaim meet the but-for test. *See Hays*, 722

S.E.2d at 927 ("Claims arise out of [t]he excluded conduct when 'but for' that conduct, there could be no claim against the insured." (internal quotation marks omitted)).  The allegations are of acts and omissions that would not have occurred had Johnny and Harley Langdale not breached their duties as trustees by using the redemption mechanism to consolidate control over TLC without having to purchase the Trust beneficiaries' TLC shares themselves.  The allegations of officer and director misconduct arose out of the allegations of misconduct as trustees of the Virginia Miller Trust.

TLC contends that the causes of action against TLC for Johnny and Harley Langdale's acts that allegedly breached the duties they owed not as trustees but as officers or directors could have existed independently from the beneficiaries' causes of action against Johnny and Harley Langdale for breaching the duties they owed as trustees of the Virginia Miller Trust.  We agree that "a claim does not 'arise out of' a circumstance if, independent of that circumstance, the claim could still exist."  *USMoney*, 288 F. App'x at 560 (internal quotation marks omitted).  But we do not agree that the beneficiaries' claims against TLC could have existed independent of their claims against Johnny and Harley Langdale as trustees.  Because the causes of action alleged against TLC could not have existed in the absence of the claims that Johnny and Harley Langdale committed wrongful acts in the uninsured capacity as trustees, Exclusion 4(g) applies.

27

The allegations of TLC's liability for its officers' and directors' misconduct asserted against TLC in Count III of the state-court complaint and in Count V of the counterclaim arise from, and necessarily rely on, the allegations that Johnny and Harley Langdale conspired as trustees to manipulate the Trust's beneficiaries into selling their shares back to TLC at an unfairly low price, enabling Johnny and Harley Langdale to consolidate their control over TLC at no personal financial cost. The allegations that TLC is vicariously liable because Johnny and Harley Langdale breached their duties as TLC officers and directors could not have existed independent of the allegations that Johnny and Harley Langdale breached their fiduciary duties as trustees of the Virginia Miller Trust.

*Continental Cas. Co. v. H.S.I. Fin. Servs., Inc.*, 466 S.E.2d 4 (Ga. 1996), is instructive. The insurer, Continental Casualty, had issued a professional liability policy to a law firm and its three named partners, Page, Sevy, and Henderson. *See id.* at 5. The policy excluded coverage for "[a]ny claim arising out of any dishonest, fraudulent, criminal, or malicious act by [an insured] or any of [an insured's] partners, officers, stockholders, or employees." *Id.* (alterations in original). HSI Financial Services, a client, sued the firm and the named partners, alleging that "Page had improperly withdrawn funds from HSI's escrow account for his personal use" and that his partners, Sevy and Henderson, had negligently "failed to supervise and ensure the proper accounting of HSI's escrowed funds."

28

*Id.* The law firm and partners presented the claim to Continental Casualty, which sued for a declaratory judgment that it was not obligated to provide a defense against HSI's claims.  Continental Casualty invoked the "dishonest, fraudulent, criminal, or malicious act" policy exclusion.  *See id.* at 6.  The federal district court ruled in the law firm's favor, applying Georgia law.

On appeal, the Eleventh Circuit "noted that Page's theft of the funds clearly [fell] within the exclusionary clause," but certified the following question to the Georgia Supreme Court about the claims against the other two partners: "Does a claim for a law partner's negligence with respect to supervising and mitigating a fellow partner's criminal act 'arise out of' 'any dishonest, fraudulent, criminal or malicious act' within the meaning of this insurance policy exclusion?"  *Id.*  The Georgia Supreme Court answered the certified question in the affirmative and explained why:

> First, as noted above, there is no doubt that Page's theft of the escrowed funds fell within the exclusion relating to "dishonest, fraudulent, criminal and malicious act[s]."  Second, it is clear that HSI's claim against Sevy and Henderson "arose out of" Page's actions, because but for Page's actions, there could be no claim against Sevy and Henderson.  Sevy and Henderson argue that because HSI's claims against them are based upon allegations that they negligently failed properly to supervise HSI's accounts, the claims merely assert independent and concurrent causes of HSI's loss, for which coverage must be provided.  However, this argument misses the mark, because the exclusionary clause is not at all concerned with whether ancillary acts of less culpable partners may have contributed to the loss which HSI suffered as a result of Page's actions.  Rather, by its express terms, the exclusionary clause is focused solely upon

29

the genesis of HSI's claims—if those claims *arose out* of Page's culpable conduct, as they did, then coverage need not be provided. Consequently, the fact that Sevy and Henderson may have negligently allowed Page to perpetuate his theft of HSI's funds does not negate the plain effect of the policy's exclusionary clause.

*Id.* at 6 (emphasis in original).

Just as the negligence claims against Page's law partners in *Continental Casualty* arose out of Page's excluded conduct, the misconduct claims against TLC based on Johnny and Harley Langdale's alleged officer or director misconduct "arose out of [their] culpable conduct" as trustees. *See id.* The breach of their duties as trustees was the genesis of the claims against TLC for the breach of their duties as officers and directors. The claims against TLC arose out of Johnny and Harley Langdale's allegedly culpable conduct as trustees, and could not have existed without that alleged wrongdoing.

The allegations that TLC's acts or omissions contributed to allowing Johnny and Harley Langdale to obtain control of TLC without personal cost, breaching their duties as trustees, does not negate the application of the exclusion. As in *Continental Casualty*, the focus is on the genesis of the underlying plaintiffs' claims. *See id.* The beneficiaries' allegations that Johnny and Harley Langdale's acts as TLC directors and officers "may have [] allowed" them to more easily "perpetuate" their scheme to control TLC by arranging for TLC to purchase the

30

beneficiaries' stock "do[] not negate the plain effect of the policy's exclusionary clause." *See id.*

TLC points to three cases in which courts rejected the insurer's argument that an "arising out of" exclusion barred coverage: *Cotton States Mut. Ins. Co. v. Crosby*, 260 S.E.2d 860 (Ga. 1979); *Fireman's Fund Ins. Co. v. Univ. of Ga. Athletic Assoc., Inc.*, 654 S.E.2d 207 (Ga. Ct. Ap. 2007); and *USMoney*, 288 F. App'x 558 (11th Cir. 2008). Each case is distinguishable. In those cases, the nexus between the uninsured acts and the insured acts was more attenuated than in this case. None of those cases involved allegations, similar to the allegations in this case, of dual-capacity misconduct committed by the same actors.

In *Cotton States*, the Georgia Supreme Court considered whether a policy provision excluding losses arising from "bodily injury" precluded a rape victim's claims against school officials for negligently failing to safeguard the school premises and for unlawfully detaining her after she was raped. 260 S.E.2d at 861. The court concluded that the negligence claims arose out of bodily injury and were excluded from coverage, but the unlawful-detention claim did not arise out of the alleged bodily injury and was not subject to the exclusion. *Id.* at 861–63. The complaint in the underlying litigation did not allege that the school officials committed the act—rape—that caused the bodily injury. The exclusion applied to the allegations that the school officials' acts facilitated or failed to prevent the rape.

31

The exclusion did not apply to allegations that the school officials committed separate wrongs that did not depend on or arise from the rape. In contrast, the beneficiaries' pleadings in the underlying litigation alleged that the same individuals who breached their duties as trustees—Johnny and Harley Langdale— also breached their duties as TLC officers and directors to obtain personal benefits at the Trust's and beneficiaries' expense.

In *Fireman's Fund*, a college football player informed the school's assistant athletic director that he wanted to get school-sponsored disability insurance. 654 S.E.2d at 211. The assistant athletic director solicited quotes and took other steps to obtain that insurance, but he had not yet obtained the insurance a few days later, when the athlete was paralyzed in a football game. The athlete sued the assistant athletic director and the school's athletic association for breach of fiduciary duties, breach of contract, and negligence in failing to have the disability insurance in place. The school's insurer asserted a policy exclusion barring claims "arising out of, in consequence of or in any way related to [b]odily [i]njury." *Id.* The Georgia Court of Appeals held that the bodily-injury exclusion did not apply. The court concluded that the claims against the school officials for failing to obtain the insurance before the athlete played arose out of the allegations that the athlete had to "face[] the hazards inherent in playing the game of football without the protection that would have been afforded by the disability insurance he requested,"

32

not out of his subsequent bodily injury. *Id.* at 214. The defendants' "actionable breaches of fiduciary or contractual duties, and/or duty of ordinary care were complete" before the athlete was hurt. *Id.* As a result, "[n]o conduct of the insureds [was] causally related to [the athlete's] bodily injury." *Id.* The "nexus" between the injury and the claims was "too attenuated to bring his claims within the ambit of the bodily injury exclusion." *Id.* at 213–14.

Here, by contrast, Johnny and Harley Langdale's alleged breaches of their duties as trustees started before, and continued throughout, the period when they allegedly breached their duties as TLC officers and directors. The breaches of the duties they owed as trustees of the Trust allegedly caused or created the harm to the beneficiaries—the sale of their stock at a below-market price. *Fireman's Fund* was "not a case in which the plaintiff claim[ed] that the insured's wrongful conduct caused or created the conditions giving rise to bodily injury to the plaintiff." *Id.* In this case, by contrast, the allegations in the underlying litigation are that Johnny and Harley Langdale's wrongful conduct as trustees "caused or created the conditions giving rise to" the harm to the beneficiaries, facilitated by the Langdales' wrongful acts as TLC directors or officers that are the basis for the direct and vicarious liability claims against TLC. *See id.*

In the third case TLC cites, *USMoney*, 288 F. App'x 558, TierOne Bank had advanced loans to the insured, USMoney, under a line of credit agreement.

33

USMoney used the loans to originate residential mortgages for sale on the open market. *Id.* at 559.  When USMoney failed to repay the loans, TierOne sued, "in part because the loans were not secured by a valid and enforceable first lien on each of the subject properties."  *Id.*  TierOne obtained a money judgment for USMoney's breach of the line-of-credit agreement, negligently submitting the funding requests, and negligently including misrepresentations in the funding requests. *Id.*  USMoney sought indemnification from its insurer, American, which invoked an exclusion barring claims "arising out of any defective deed or title." *Id.* at 560.  USMoney argued that, regardless of the lien status, TierOne still "would [] have had valid claims against [USMoney] based upon its negligence and breach of contract in submitting forged appraisals and fraudulent insured closing letters."  *Id.* at 561 (internal quotation marks omitted).  USMoney asserted that "TierOne's damages resulted as much from the forged appraisals and lack of closing insurance as they did from the lack of valid title, because forged appraisals and lack of closing insurance renders the mortgages unmarketable."  *Id.*  The insurer responded that "the fraudulent closing letter and forged appraisal would not have been necessary if USMoney had valid title to the property, because the borrowers could have obtained a legitimate appraisal and a legitimate closing letter."  *Id.* at 561–62 (internal quotation marks omitted).

34

The Eleventh Circuit, applying Georgia law, found that "both parties [were] partially correct." *Id.* at 562. The court held that American was "under a duty to indemnify USMoney against two of TierOne's claims—breach of contract and negligent misrepresentation." *Id.* The court reached this conclusion "because the excluded circumstance—defective title—was not necessary to [these claims]":

> [A]lthough . . . USMoney breached the Line of Credit Agreement in part because it failed to ensure TierOne had a valid first lien on the real estate for which the loans at issue were made[,] . . . USMoney [also] breached the Agreement by submitt[ing] funding requests to TierOne with representations and covenants containing false and inaccurate information. Examples of false information submitted by USMoney include the names and licensures of various closing companies or their agents. Because USMoney *breached the Agreement in ways unrelated to defective title*, the breach of contract claim does not "arise out of" the exclusion.
>
> . . . .
>
> Similarly, although the court found that USMoney negligently represented that the loans . . . were secured by valid first liens on the real estate, it went on to list *further negligent representations by USMoney. USMoney could have made these negligent representations even with good title*, and therefore, this claim does not "arise out of" defective title.

*Id.* at 562 (internal quotation marks, ellipses, and citations omitted) (emphasis added). Because TierOne "could have maintained" its claims for breach of contract and negligent misrepresentation "against USMoney even if USMoney had obtained valid first liens securing the loans," the court held that neither "arose out" of the defective title. *Id.*

35

Here, unlike the breach-of-contract and negligent-misrepresentation claims in *USMoney*, Count III of the beneficiaries' state-court complaint and Count V of the counterclaim did not allege that TLC's directors committed wrongful acts "in ways unrelated" to Johnny and Harley Langdale's wrongdoing as trustees. The allegations could not have been made if Johnny and Harley Langdale had not approved the Shareholders' Agreement on the Trust beneficiaries' behalf, misinformed the beneficiaries about the Trust's termination date, or misrepresented the value of the Trust's TLC stock. The claims in the underlying litigation against TLC for corporate wrongdoing necessarily included claims that Johnny and Harley Langdale breached the duties they owed as trustees to the Virginia Miller Trust beneficiaries, who were also the company's minority shareholders. The allegedly wrongful acts committed by TLC and by TLC directors would not have occurred but for Johnny and Harley Langdale's alleged wrongful acts as trustees.

TLC contends that because Johnny and Harley Langdale were TLC directors and officers when they perpetrated the scheme to obtain control of TLC by causing TLC to purchase the beneficiaries' shares at an unfairly low price, they necessarily acted in a capacity within the D&O coverage. But although Johnny and Harley Langdale were TLC directors during this period, their wrongful acts as TLC directors arose out of their wrongful acts as trustees of the Trust. For example, the underlying litigation pleadings allege that before breaching their duties to TLC as

36

directors, and before causing TLC to approve the Redemption Agreement, they breached their duties as trustees by signing the Shareholders' Agreement on the Trust beneficiaries' behalf; misinforming the Trust beneficiaries about the Trust's termination date; and misrepresenting the value of the Trust's TLC shares.  But for these alleged wrongful acts, Johnny and Harley Langdale would not have been able to breach their duties as TLC directors and officers, or cause TLC to commit allegedly wrongful acts, by approving the Redemption Agreement and executing the transaction without their co-directors' or the minority shareholders' approval.

To the extent that Johnny and Harley Langdale were allegedly acting as directors and officers, that misconduct was so inextricably entwined with their alleged misconduct as trustees that the duty to advance defense costs was not triggered.  *See Cont'l Cas. Co. v. Adams*, No. 3:CV02-1122, 2003 WL 22162379, at \*9 (M.D. Pa. Sept. 12, 2003) (applying a similar policy exclusion because "the allegations . . . in the Underlying Action plainly show[ed] Adams and Leighton acting simultaneously in dual capacities: as officers and directors of both the insured and the uninsured corporations" and "[t]heir alleged negligent supervision of Sabol applie[d] both in their capacities as officers and directors of HSC, as well as in their capacities as officers and directors of HSCM"); *Coregis Ins. Co. v. Bartos, Broughal & DeVito, LLP*, 37 F. Supp. 2d 391, 394 & n.4 (E.D. Pa. 1999) (holding that a similar exclusion precluded coverage for an insured's employee

37

who "was an officer, director and shareholder of . . . a business enterprise other than the named insured" and who "solicited investors" on behalf of that noninsured business enterprise); *cf. McAninch v. Wintermute*, 491 F.3d 759, 772 (8th Cir. 2007) (holding that "an insurer may not avoid its duty to indemnify for alleged wrongful conduct merely by arguing the director was also an owner, shareholder, etc., *without some explanation as to how this dual capacity relates to or facilitated the wrongful conduct alleged*" (emphasis added)).

TLC argues that Johnny Langdale's actions as trustee could not have been the but-for cause of the Redemption Agreement and transaction because he was no longer a trustee when the Agreement was signed and the redemption sale occurred. TLC supports this assertion by pointing to the Redemption Agreement, which Harley Langdale—and not Johnny Langdale—signed as trustee. But the gravamen of the state-court complaint and the counterclaim is that Johnny and Harley Langdale conspired to breach their duties as trustees well before the Redemption Agreement was signed, to deprive the beneficiaries of the proper value of their TLC shares and consolidate their own control over TLC. The pleadings allege that "[n]otwithstanding Johnny's strategically timed resignation, he planned and participated in the conspiracy to transfer the Trust's stock at an unfair and absurdly low price." [R. 77-52, at 45.] The state-court complaint and the counterclaim alleged that Johnny Langdale resigned as trustee just before Harley Langdale

38

signed the Redemption Agreement for the Trust, agreeing to sell the Trust shares to TLC at a below-market price. Johnny Langdale signed for TLC. The pleadings allege that Johnny Langdale resigned as a trustee of the Trust to avoid signing the Redemption Agreement on behalf of *both* TLC and the Trust. The counterclaim allegations also make clear, however, that the Redemption Agreement was signed and the redemption sale occurred because Johnny and Harley Langdale had previously approved the Shareholders' Agreement on the Trust's behalf as trustees; failed to disclose material information to the Trust beneficiaries; and repeatedly misled the beneficiaries, all while Johnny Langdale was still a trustee.

TLC argues that its decision to indemnify Johnny Langdale shows that the claims asserted in the underlying litigation did not arise out of his "actions in a capacity other than as a TLC [e]xecutive." Aplt. Br. at 23. Georgia Code § 14-2-853 allows corporations to "advance funds to pay for or reimburse the reasonable expenses incurred by a director who is a party to a proceeding because he or she is a director if he or she delivers to the corporation": (1) "[a] written affirmation of his or her good faith belief that he or she has met the relevant standard of conduct," including acting in the company's best interests in "his or her official capacity"; and (2) a written agreement to "repay any funds advanced if it is ultimately determined that the director is not entitled to indemnification." GA. CODE ANN. §§ 14-2-853; 14-2-851. TLC argues that Johnny Langdale's written affirmation "that

39

his actions alleged in the lawsuit against him were conducted as an officer and director of" TLC "contradicts" the district court's conclusion that the claims arose out of Johnny Langdale's actions in a noninsured capacity. Aplt. Br. at 23. But, as TLC itself acknowledges, "an insured company could agree to indemnify an employee for something he/she has done that had nothing whatsoever to do with the company's business." [*Id.*] The risk of an insured creating coverage by agreeing to indemnify a director who allegedly committed wrongful acts is greater when, as here, the director has substantial control over the insured company, including over deciding whether to indemnify. TLC's affirmation about Johnny Langdale and the capacity in which he acted and was sued does not bring the claims within the policy's coverage.

TLC contends that National Union's letters offering to advance defense costs for only Count III of the state-court complaint and Count V of the counterclaim have "evidentiary value with respect to how National Union interprets its own policy" and "should preclude the grant of summary judgment" on Exclusion 4(g). Aplt. Br. at 35. But "[i]n summary judgments involving contract cases, the construction of a contract is a question of law for the trial court 'where the language of a contract is clear and unambiguous and capable of only one reasonable interpretation as applied to the subject matter.'" *Nolley v. Md. Cas. Ins. Co.*, 476 S.E.2d 622, 624 (Ga. Ct. App. 1996) (quoting *Bress v. Keep-Safe*

40

*Indus.*, 271 S.E.2d 867, 869 (Ga. Ct. App. 1980)). TLC does not argue that National Union waived, or should be estopped from asserting, Exclusion 4(g). *See* Aplt. Br. at 35.[8]

The claims against TLC for Johnny and Harley Langdale's alleged misconduct as directors and officers could not have existed independent from their alleged misconduct as trustees of the Virginia Miller Trust. The claims against Johnny and Harley Langdale as TLC directors and officers could not have existed independent from their alleged misconduct as trustees. The allegations of wrongdoing in Counts III and V of the state-court complaint and the counterclaim "arose out of" Johnny and Harley Langdale's wrongful acts in their capacities as trustees, and are subject to Exclusion 4(g).[9]

---

[8] TLC also argues that National Union's admission that the underlying litigation "includes allegations made against Mr. Langdale in his insured capacity as an Executive/Employee of [TLC]" shows that Exclusion 4(g) does not apply. Aplt. Br. at 27–28 (emphasis omitted). [*See also* R. 84, ¶ 121.] But TLC misunderstands Exclusion 4(g). The exclusion applies to exclude otherwise covered wrongful acts that happen to "aris[e] out of" acts undertaken in a non-covered capacity. That is the case here.

[9] TLC argues that this conclusion makes coverage "illusory" and undermines longstanding Georgia law that the duty to defend extends to every claim that arguably falls within the scope of coverage and that "where an insurer has a duty to defend a single claim the complaint presents, it has a duty to defend all the claims asserted." *HDI-Gerling Am. Ins. Co.*, 701 F.3d at 666. But just as the duty to defend may extend to claims that do not arguably fall within the scope of coverage because of one covered claim, it may be excluded from claims that otherwise do fall within the policy's terms if the exclusion is an "arising out of" provision, such as Exclusion 4(g). "[T]hat is the nature of an exclusion—to exclude things that otherwise would be covered, when certain conditions are met." *Cynergy, LLC v. First Am. Title Ins. Co.*, 706 F.3d 1321, 1327 (11th Cir. 2013).

We affirm the district court's grant of summary judgment dismissing TLC's claims for breach of contract and for a declaratory judgment on the basis that Exclusion 4(g) bars coverage.

### B. Whether TLC's Bad Faith Claim Fails as a Matter of Law

TLC also appeals the district court's grant of summary judgment dismissing its bad-faith claim.  Because the district court properly found no coverage under the D&O policy, we affirm the grant of summary judgment dismissing TLC's bad-faith claim.  *See OneBeacon Am. Ins. Co. v. Catholic Diocese of Savannah*, 477 F. App'x 665, 673 (11th Cir. 2012) ("Under Georgia law, there can be no recovery for bad faith when there is no coverage." (citing *Morris v. Ins. Co. of N. Am.*, 151 S.E.2d 813, 814 (Ga. Ct. App. 1966)); *BayRock Mortg. Corp. v. Chicago Title Ins. Co.*, 648 S.E.2d 433, 435 (Ga. Ct. App. 2007) (requiring that the insured prove "that the claim is covered under the policy" to prevail on a bad-faith claim under GA. CODE ANN. § 33-4-6).

### IV.   CONCLUSION

We **AFFIRM** the judgment of the district court.

42